# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**PATRICK C. COTTER**                                          **CIVIL ACTION**

**VERSUS**                                                          **No. 15-4823**

**BRUCE A. GWYN ET AL.**                                      **SECTION H**

## ORDER AND REASONS

Before the Court are Defendants Turn Key Hedge Funds, Inc. ("Turn Key") and Michael Lapat's ("Lapat") (collectively "TK&L") Motion to Dismiss (Doc. 10); Defendant Anne Marie Gwyn's ("A. Gwyn") Motion to Dismiss (Doc. 17); Defendant Treaty Energy Corporation's ("Treaty") Motion to Dismiss (Doc. 18); and TK&L's Motion to Dismiss Cross-Claims (Doc. 37).  For the following reasons, TK&L's Motion to Dismiss Cross-Claims is **GRANTED**. The remaining motions are **DENIED**.

## BACKGROUND

### I.    General factual and procedural background

This matter arises out of the failure of a "commodity pool," a type of hedge fund that trades in commodities futures contracts. "Commodities futures contracts are instruments that allow parties to agree to buy and sell a

particular commodity at a future date."[1]  "A commodity pool is the commodity-futures equivalent of a mutual fund; the investor buys shares in the pool and the operator of the pool invests the proceeds in commodity futures."[2]  "They are vehicles through which investors can aggregate their funds, allowing a commodity pool operator to invest them for a fee."[3]

Level III Trading Partners, L.P. ("Level III" or "the Fund") was a commodity pool created in February 2007 by Defendant Bruce A. Gwyn ("Gwyn").  According to the Complaint, the Fund attracted approximately $ 2.7 million in investments from its inception in 2007 to its filing for bankruptcy in 2013.  From 2007 to 2010, the fund successfully and profitably operated as a commodity pool.

Beginning in 2010, however, Gwyn allegedly began divesting the fund of commodities futures and investing its assets in companies controlled by Gwyn and his close business associate, Defendant Andrew V. Reid ("Reid").  The Complaint claims that "[t]his scheme involved [transfers] in the guise of loans, purchases of stock, and purchases of limited liability company membership interests."[4]  These transfers were allegedly part of a larger fraudulent scheme to artificially inflate the stock prices of two public companies, Defendants Treaty and Orpheum Properties, Inc. ("Orpheum").  Gwyn and Reid were officers and directors of Treaty and Orpheum, and they maintained substantial

---

[1] *W. Capital Design, LLC v. New York Mercantile Exch.*, 180 F. Supp. 2d 438, 440 (S.D.N.Y. 2001).

[2] *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 965 (7th Cir. 1986).

[3] *Commodity Futures Trading Comm'n v. Equity Fin. Grp. LLC*, 572 F.3d 150, 155 (3d Cir. 2009). Commodity pools in the United States are regulated by the Commodity Futures Trading Commission and the National Futures Association.  *See Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 169 (D.D.C. 2012); *Investopedia*, http://www.investopedia.com/terms/c/commoditypool.asp (last visited May 24, 2016).  The term "commodity pool" is a legal term as set forth by the National Futures Association. *National Futures Association Glossary*, https://www.nfa.futures.org/BasicNet/glossary .aspx?term=C (last visited May 24, 2016).

[4] Doc. 1, at 2.

financial interests in both companies.  The Complaint also claims that Gwyn misappropriated money from the fund by diverting cash for his own personal use and by improperly charging the fund for fictitious administrative services purportedly performed by Gwyn and his wife, defendant A. Gwyn.

In order to hide his self-dealing and the depletion of the fund's assets from its investors, the Complaint alleges that Gwyn disclosed false investment performance reports, false asset values, and fraudulent account statements to the fund's investors.  Many of these reports to investors were allegedly prepared and sent by Defendants TK&L.  In addition to hiding Level III's value and the nature of its investments from current investors, Gwyn allegedly continued to accept additional investments from current investors, as well as limited partner subscriptions to the Fund from new investors looking to invest in a commodity pool.

After Level III's investors learned of the scheme, they filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code on August 2, 2013.[5]   The bankruptcy court later converted the matter into a voluntary petition for bankruptcy pursuant to Chapter 11.[6]  On July 11, 2014, the bankruptcy court confirmed a Chapter 11 plan for reorganization and established a "Litigation Trust."   It appointed Plaintiff, Patrick C. Cotter ("Cotter" or "the Trustee") as the "Trustee of the Litigation Trust created by the plan."[7]   The litigation trustee represents the bankruptcy estate by assuming the obligation to prosecute the bankruptcy estate's claims for the benefit of creditors.[8]   The Chapter 11 plan in this case authorizes the trustee to bring all claims on behalf of the bankrupt debtor's estate.[9]

---

[5] *In re Level III Trading Partners, L.P.*, No. 13-12120 (Bankr. E.D. La. Aug. 2, 2013).

[6] *In re Level III Trading Partners, L.P.*, No. 13-12120 (Bankr. E.D. La. Oct. 1, 2013).

[7] *In re Level III Trading Partners, L.P.*, No. 13-12120, at *2 (Bankr. E.D. La. July 11, 2014).

[8] *In re Railworks Corp.*, 325 B.R. 709, 719 (Bankr. D. Md. 2005).

[9] *In re Level III Trading Partners, L.P.*, No. 13-12120, at *9 (Bankr. E.D. La. May 27, 2014).

On September 28, 2015, Cotter filed the above-captioned action in this Court in his capacity as trustee of the Level III Trading Partners, L.P. Litigation Trust.  The Trustee's Complaint asserts seventeen claims for relief against eleven defendants, and he seeks to avoid various pre-petition transactions on behalf of the debtor.  The matter was initially referred to the bankruptcy court, but the referral was withdrawn on March 9, 2016.  Defendants TK&L, A. Gwyn, and Treaty have filed motions to dismiss the claims against them.  After a more detailed review of the facts of the Complaint, this Court will address each motion in turn.

## II.    Specific allegations against TK&L

The Complaint devotes five-and-a-half pages specifically to allegations against TK&L, in addition to other scattered references throughout.  It states that "Turn Key was the fund's third-party administrator and professional consultant from the fund's inception in 2007 through March of 2012."[10]  It alleges that Lapat "is an attorney licensed to practice law in Florida," "[is] the president and principal of [Turn Key]," and that he "provided legal services and advice to the fund through Turn Key and/or his law firm."[11]

The Complaint alleges that Gwyn hired TK&L in February 2007 to provide all of the necessary hedge fund start-up services, including the preparation of offering and subscription documents and the partnership agreement.  "Thereafter, pursuant to its contract with Level III, Turn Key provided hedge fund administration services, investor management services, accounting management services, and compliance management services to Level III."[12]  These services included "analyzing Level III's financial information and performance, communicating with [Defendant Kaplan &

---

[10] Doc. 1, at 6.
[11] Doc. 1, at 6.
[12] Doc. 1, at 12.

Company ("Kaplan"), a CPA firm,] regarding financial statements, calculating the fund's net asset value, and calculating each investor's capital account value."[13]   TK&L were then allegedly responsible for distributing much of this information to the fund's investors.   The Complaint claims that Level III also engaged the legal services of Turn Key's president and principal, Lapat, who provided guidance regarding regulatory compliance and Level III's purchases of interests and stock in the companies discussed in the Complaint.

The Complaint states that in late 2009, when Gwyn decided to divest the fund of commodities futures and make private investments, TK&L advised Gwyn that Level III's offering documents did not authorize such investments and instead limited the fund to commodities futures products.   Accordingly, in order to permit such private investments, "in December 2009, Turn Key revised the Executive Summary that was provided to potential investors to state that, in addition to trading futures contracts and options, the fund [could] also invest 0% to 10% of its assets in private securities and privately held micro-cap companies."[14]   The Complaint alleges, however, that by the end of 2011 Gwyn had, "with the knowledge and assistance of [TK&L]," used nearly 100% of the Fund's assets to either invest in small, closely-held companies that he and Reid owned or controlled or to buy stock in Orpheum and Treaty. Although the Fund allegedly derived no value from the self-interested investments and, indeed, the Fund's value was depleted because of them, "Turn Key continued to report to the partnership and its investors in 2010 and 2011 that the fund's net asset value was in the range of $1.3 to $1.6 million, based on unsupported and inflated values assigned to the fund's holdings and interests in these companies."[15]

---

[13] Doc. 1, at 12.
[14] Doc. 1, at 7.
[15] Doc. 1, at 9.

According to the Complaint, TK&L's agreement with Level III obligated them to render a number of services for the fund, the performance of which gave TK&L a thorough understanding of the affairs of Level III.[16]   The Complaint states that TK&L "regularly reviewed Level III's bank statements and expense receipts and frequently noted and questioned Gwyn regarding charges that were unrelated to the fund, issues with the amount of incentive allocation that was withdrawn by [Level III Management, LLC ("L3M")][17] and/or Gwyn, and issues with loans that were made to Gwyn's affiliates."[18] TK&L also allegedly reviewed the operating agreements of the companies in which Level III invested, revised correspondence that Gwyn prepared for the Fund's investors and potential investors, reviewed potential stock purchases, and acted as a liaison between Level III and auditors or regulatory agencies.[19]

The Trustee alleges that, as a result of their services, TK&L were aware of Gwyn's self-dealing investments, his collection of fraudulent management fees, his regular use of the Fund's cash for personal expenses, and the unsecured and under-collateralized loans to his affiliates.  The Trustee also claims that "[TK&L] knew that the value of the fund's investments and the fund's investment performance were fraudulently inflated and misrepresented in financial statements that were provided to the partnership and its investors."[20]  The Trustee alleges that TK&L assisted Gwyn in the self-dealing transactions on multiple occasions by preparing, reviewing, commenting on, and editing purchase and loan agreements.[21]

---

[16] Doc. 1, at 12–13.

[17] According to the Complaint, L3M was the general partner that managed Level III, and it was owned and operated by Gwyn.  Doc. 1, at 4.

[18] Doc. 1, at 13.

[19] Doc. 1, at 13–14.

[20] Doc. 1, at 15.

[21] The Complaint specifically names several of the agreements on which TK&L allegedly worked.  Doc. 1, at 14.

The Complaint further alleges that during this period Gwyn and/or his wife charged the fund $3,000 per month for administrative services that were never actually provided.  "[TK&L] not only expressly authorized these expenditures despite knowing that they were providing all of the fund's necessary administrative services but, at the request of Gwyn, they revised the partnership agreement specifically to allow for L3M to be reimbursed for additional alleged administrative costs."[22]  The Complaint states that TK&L "knew about and authorized" charges to the fund from 2010 through June 2012 of $1,000 per month by Gwyn and/or his wife for rent of their residence.  This amount was allegedly excessive and/or unnecessary, provided less than reasonably equivalent value to the fund, and caused or contributed to Level III's insolvency.

Although the Trustee admits that TK&L occasionally advised Gwyn that certain charges, advances, and loans were prohibited, he claims that they otherwise failed to satisfy the standard of care that they owed to Level III. According to the Complaint, TK&L did not disclose the self-dealing to the partnership and its limited partners or advise Gwyn that such disclosures were required despite their duty to do so.  In addition, the Complaint claims that TK&L repeatedly sent financial reports and account statements to the investors that reflected unsupported values assigned to private investments.[23] It alleges that TK&L did so even though they were responsible for drafting the fund's partnership agreement and knew that private investments like those made in 2010 and 2011 were required to be carried in a side pocket memorandum and could not be used to calculate the fund's net asset value.

---

[22] Doc. 1, at 9.
[23] Doc. 1, at 15.

7

The Complaint states that TK&L continued to prepare such reports and facilitate such investments even though, beginning in 2010, Gwyn did not send them information in a timely manner and continuously provided them "with inadequate, inaccurate, incomplete, inconsistent, confusing, continually changing, ambiguous, and/or generally deficient supporting documentation regarding an increasingly large percentage of the Partnership's investments and transactions."[24]

Despite an audit of Level III by the National Futures Association ("NFA") in March of 2011, TK&L allegedly continued to provide the above-described services until they permanently terminated their relationship with Level III in March 2012. In summation of his allegations against TK&L, the Trustee states in the Complaint:

> [TK&L] played an integral role in perpetuating Gwyn's fraudulent scheme. [TK&L] assisted and aided Gwyn in misappropriating investors' funds and misleading customers regarding the value of their investments in the fund by preparing monthly statements which they knew contained false or grossly inflated and unsupported values. Without their assistance, Level III could not have operated, and Gwyn could not have succeeded in defrauding the fund and its investors. [TK&L] were in a position to prevent or halt the fraud, but they failed to do so. If Turn Key and/or Lapat had disclosed to the partnership and the fund's subscribers Gwyn's personal interest in Level III's private investments and questionable transactions and/or that Level III's financial statements were materially misstated and not in accordance with generally accepted accounting principles, or if Turn Key and/or Lapat had qualified the disseminated information with a going concern qualification, the corresponding losses to Level III as a result of Gwyn's systematic self-dealing would have been avoided.[25]

---

[24] Doc. 1, at 15. The trustee claims that this characterization is taken from "[TK&L's] own words," but he does not cite to the source of the alleged quotations.
[25] Doc. 1, at 16–17.

### III.     Specific allegations against A. Gwyn and Treaty

#### a.  A. Gwyn

The Complaint alleges that the fund made several fraudulent transfers to Gwyn and A. Gwyn from August to December 2010 and from January 2011 to June 2012.[26]   These transfers were made for, among other things, "administrative services" that the Trustee claims were never actually performed and "rent" that the Trustee argues was unreasonably excessive.[27] The transfers totaled approximately $335,000.[28]   The Complaint also claims that several hundred thousand dollars that were allegedly fraudulently transferred to Defendant GAGA, LLC ("GAGA") should be deemed transfers to and for the benefit of Gwyn and A. Gwyn.[29]   The Trustee seeks to undo each of these allegedly fraudulent transactions.

#### b.  Treaty

According to the Complaint, Defendant Reid was CEO, a chairman of the board, and a major shareholder of Treaty.   Gwyn was either co-CEO or COO, a member of the board, and a major shareholder of Treaty.   As referenced above, Treaty is one of the companies in which Gwyn invested Level III's assets without the knowledge and to the detriment of Level III's investors.   The transfers were allegedly made to artificially inflate the share price of Treaty. The Complaint also asserts that, as CEO, Gwyn began receiving "substantial payments from Treaty."[30]   The Trustee seeks to undo these transactions.

---

[26] Doc. 1, at 21.
[27] Doc. 1, at 9.
[28] Doc. 1, at 21.
[29] Doc. 1, at 21–22.
[30] Doc. 1, at 8.

## LEGAL STANDARD

### I.     Federal Rule of Civil Procedure 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim for relief that is plausible on its face."[31] A claim is "plausible on its face" when the pleaded facts allow the court to "draw reasonable inference that the defendant is liable for the misconduct alleged."[32] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[33]  The court need not, however, accept as true legal conclusions couched as factual allegations.[34] To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[35]  If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[36] The court's review is limited to the complaint and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.[37]

### II.     Federal Rule of Civil Procedure 9(b)

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Pleading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the

---

[31] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

[32] *Id.*

[33] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

[34] *Iqbal*, 556 U.S. at 678.

[35] *Id.*

[36] *Lormand*, 565 F.3d at 255–57.

[37] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

misrepresentation and what [that person] obtained thereby.'"[38]    In other words, "the who, what, when, and where must be laid out . . . ."[39]

"A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6).[40] "Rule 9(b) is an exception to Rule 8(a)'s simplified pleading that calls for a 'short and plain statement of the claim.' The particularity demanded by Rule 9(b) is supplemental to the Supreme Court's recent interpretation of Rule 8(a) requiring 'enough facts [taken as true] to state a claim to relief that is plausible on its face.'"[41] As the Fifth Circuit has further explained:

> In cases of fraud, Rule 9(b) has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later. We apply Rule 9(b) to fraud complaints with "bite" and "without apology," [*Williams*, 112 F.3d at 178] but also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not "reflect a subscription to fact pleading" [*id.*] and requires only "simple, concise, and direct" allegations of the "circumstances constituting fraud," which after *Twombly* must make relief plausible, not merely conceivable, when taken as true.[42]

## III.  Pleading Standard under the Private Securities Litigation Reform Act of 1995 (the "PSLRA")

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA, 15 U.S.C § 78u *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions.[43] This PSLRA

---

[38] *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997).

[39] *Id.* at 178.

[40] U.*S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997).

[41] *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570).

[42] *Id.* at 185–86.

[43] *SEC v. Blackburn*, No. 15-2451, 2015 WL 9459976, at *6 (E.D. La. Dec. 28, 2015).

heightened pleading standard is targeted at preventing abusive securities litigation.[44]

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss.[45]  First, under 15 U.S.C. § 78u–4(b)(1), the complaint must specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.  Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[46]

Only the second requirement "alters the usual contours of a Rule 12(b)(6) ruling."[47]  Instead of drawing all reasonable inferences in the plaintiff's favor, the Court "must take into account plausible inferences opposing as well as supporting a strong inference of scienter."[48]  This includes any "nonculpable explanations for the defendant's conduct."[49]  "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible,'" in light of other explanations.[50]  In other words, a plaintiff can only satisfy

---

[44] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class–action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep–pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent . . .") (internal quotations and citations omitted).

[45] *See Lormand*, 565 F.3d at 239; 15 U.S.C. § 78u–4(b)(3)(A).

[46] 15 U.S.C. § 78u–4(b)(2).

[47] *Lormand*, 565 F.3d at 239.

[48] *Id.*

[49] *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 551 (5th Cir. 2007).

[50] *Lormand*, 565 F.3d at 239; *see also Cent. Laborers'*, 497 F.3d at 551.

the scienter requirement if the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged."[51]  While omissions and ambiguities count against inferring scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."[52]

A plaintiff may satisfy this heightened pleading requirement by alleging facts showing a motive to commit fraud and a clear opportunity to do so, or by identifying circumstances indicating conscious or reckless behavior by defendants, so long as the totality of allegations raises a strong inference of fraudulent intent.[53]  "Although the strong-inference pleading standard does not license courts to resolve disputed facts at the motion to dismiss stage, it does permit the court to 'engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak.'"[54]

## LAW AND ANALYSIS

## I.   TK&L's Motion to Dismiss (Doc. 10)

The Trustee asserts seven claims against Turn Key[55]  and five claims against Lapat.[56]   TK&L move to dismiss only the claims against them made

---

[51] *Tellabs*, 551 U.S. at 324.

[52] *Id.* at 326.

[53] *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, No. 13-3935, 2015 WL 7454598, at *9 (E.D. La. Nov. 23, 2015) (Vance, J.) (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

[54] *Id.* (quoting *Cent. Laborers'*, 497 F.3d at 551).

[55] The Complaint makes the following claims against Turn Key: (1) violation of Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) *et seq.*, and Rule 10b–5 as promulgated thereunder, (2) violation of state securities laws, (3) professional malpractice and negligence, (4) aiding and abetting certain co-defendants' wrongful actions, (5) breach of contract, (6) civil conspiracy, and (7) misrepresentations and omissions.  Doc. 1, at 26–41.

[56] The Complaint makes the following claims against Lapat: (1) violation of Section 20 of the Exchange Act, (2) violation of state securities laws, (3) professional malpractice and negligence, (4) aiding and abetting certain co-defendants' wrongful actions, and (5) civil conspiracy.  Doc. 1, at 26–41.

pursuant to the Securities Exchange Act of 1934 (the "Exchange Act").  The Trustee has brought claims pursuant Section 10(b) of the Exchange Act against Turn Key and pursuant to Section 20 of the Exchange Act against Lapat. Because Section 20 merely seeks to hold Labat jointly liable with Turn Key as the "control person" of the entity, the Court need only find that the Trustee has sufficiently alleged an underlying violation of the Exchange Act.  Accordingly, this Court will address the Trustee's allegations under Section 10.

### A. Section 10(b)

"Congress enacted § 10(b) to insure honest securities markets and thereby promote investor confidence."[57]  Section 10(b) makes it unlawful for a person to:

> use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [U.S. Securities and Exchange Commission ("SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors.[58]

The SEC, pursuant to this section, promulgated Rule 10b–5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.[59]

---

[57] *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1075 (2014).
[58] 15 U.S.C. § 78j(b).
[59] 17 C.F.R. § 240.10b–5.

TK&L's motion to dismiss assumes that the only claim the trustee alleges against them pursuant to Rule 10b–5 is a claim under Rule 10b–5(b). In his opposition, however, the Trustee clarifies that he is asserting claims under Rules 10b–5(a) and 10b–5(c), commonly referred to as "scheme liability," in addition to his claim under Rule 10b–5(b).[60]  The Complaint supports that assertion.[61]  This Court will address each claim in turn.

      i.    *Rules 10b–5(a) and 10b–5(c)*

TK&L allege that the Trustee's Complaint fails to plead with particularity any manipulative acts that it performed and the effect those acts had on the Fund. "To state a claim based on conduct violating Rule 10b–5(a) and (c), [a] plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."[62]  Thus, a claim of liability for violations of Rule 10b–5(a) or 10b–5(c) does not require an allegation that the defendant made a misleading statement, "as liability is premised on a course of deceptive conduct undertaken by the defendant, rather than on misrepresentations or omissions."[63]  Courts have explained that "'courts must scrutinize [a scheme

---

[60] Doc. 28, at 15.

[61] Indeed, the Complaint mirrors the language of Rule 10b–5:

    Turn Key, Kaplan, and Gwyn violated § 10 of the 1934 Act and Rule 10b–5 in that they:

        a.  employed devices, schemes and artifices to defraud;

        b.  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.  engaged in acts, practices and a course of business that operated as a fraud or deceit upon Level III and its investors.

Doc. 1, at 32.

[62] *In re Alstom SA*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. H-01-3624, 2006 WL 6892915, at *3 n.8 (S.D. Tex. Dec. 4, 2006).

[63] *In re Alstom SA*, 406 F. Supp. 2d at 474.

liability claim under Rule 10b–5(a) or 10b–5(c)] to ensure that misrepresentation or omission claims [under Rule 10b–5(b)] do not proceed under the scheme liability rubric.'"[64]  "Courts have 'not allowed subsections (a) and (c) of Rule 10b–5 to be used as a back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5.'"[65]  "Accordingly, where 'the core misconduct alleged is in fact a misstatement, it [is] improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'"[66]  "Scheme liability thus hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."[67]

Claims for liability under Rule 10b–5(a) or 10b–5(c) need not comport with the PSLRA's pleading requirement that "a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief."[68]  However, claims under Rule 10b–5(a) or 10b–5(c) must satisfy the PSLRA's heightened pleading requirement as to scienter. [69]

---

[64] *S.E.C. v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) (quoting *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)).

[65] *S.E.C. v. Farmer*, 2015 WL 5838867, at *14 (quoting *SEC v. Kelly*, 817 F.Supp.2d 340, 343 (S.D.N.Y. 2011)); *see also Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-3125-L, 2014 WL 4851558, at *12 (N.D. Tex. Sept. 30, 2014) ("Town North's pleadings . . . focus solely on alleged misrepresentations and omissions by Defendants [and in spite of Town North's contrary arguments] [t]he court therefore construes Town North's claim as one for alleged federal securities violations under [Rule 10b–5(b), not  10b–5(a) or 10b–5(c).]").

[66] *S.E.C. v. Farmer*, 2015 WL 5838867, at *14 (quoting *SEC v. KPMG LLP*, 412 F.Supp.2d 349, 377–78 (S.D.N.Y. 2006)).

[67] *Id.* (internal quotation and citations omitted); *see also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules  10b–5(a) and (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) (same).

[68] *In re Alstom SA,* 406 F. Supp. 2d at 475.

[69] *Id.*; *see also In re Enron Corp.*, 2006 WL 6892915 at *3 ("The heightened pleading requirements of the [PSLRA] apply to the pleading of scienter, while the Rule 9(b) standard for pleading fraud applies to pleading claims under Rule 10b–5(a) and (c).").

The Trustee argues that the Complaint adequately alleges scheme liability because "although the Trustee has identified actionable misrepresentations and false statements regarding Level III's [net asset value] that were repeatedly made to investors, the Complaint also outlines in detail a broader scheme in which [TK&L] participated that allowed Mr. Gwyn to hide his self-dealing and contributed to the false impression that Level III was continuing to operate successfully and profitably."[70]   The Court agrees. Viewing the Complaint in the light most favorable to the Trustee, it alleges that TK&L performed deceptive acts that were distinct from TK&L's alleged misrepresentations to the investors.

For example, the Complaint accuses TK&L of facilitating Gwyn's self-interested investments in spite of TK&L's knowledge that those investments were prohibited.  The Complaint also alleges that TK&L expressly authorized Gwyn's expenditures for administrative services that TK&L knew or should have known were fraudulent.  While the Trustee argues that TK&L is liable for failing to report these transactions to investors, he also faults TK&L with enabling these transactions in the first place.  Thus the Court cannot conclude at this stage in the proceedings that the Trustee's Complaint alleges only that TK&L made material misrepresentation and omissions and did not engage in other deceptive conduct.  The Trustee's claims pursuant to Rules 10b–5(a) and 10b–5(c) stand.

i.    *Rule 10b–5(b)*

TK&L next argue that the Trustee's claims under Rule 10b–5(b) should be dismissed because (1) the Complaint does not meet the heightened pleading requirements for scienter as set forth by the PSLRA and (2) TK&L are not

---

[70] Doc. 28, at 16.

"makers" within the meaning of Section 10b–5(b).  This Court will address each argument in turn.

    1.  Scienter

    TK&L argue that the Trustee has not pled sufficient facts to give rise to a strong inference that their actions were intentionally malevolent or constituted an extreme departure from the standard of ordinary care.  They also argue that the Trustee fails to identify "a specific corporate officer or employee who acted with the requisite mental state in relation to each purported misrepresentation attributed to the company."[71]   Where the Complaint does occasionally attribute to Turn Key a particular misrepresentation or omission by Lapat, TK&L argue that the Complaint does not provide sufficient detail to infer that Lapat possessed the necessary mental state.

    In response, the Trustee argues that "[i]f the Court takes a holistic view of the Complaint's allegations regarding Mr. Lapat's conduct, knowledge, and state of mind, those collective allegations give rise to a strong plausible inference of scienter on behalf of Turn Key."[72]   "When these allegations are read together and accepted as true," the Trustee alleges, "the only inference that can be drawn is that Turn Key, through Mr. Lapat, at a minimum, acted with severe recklessness as Mr. Lapat had to know of the obvious danger that investors were being misled by Turn Key's conduct, omissions, and statements regarding the fund's value in 2010 and 2011."[73]

    In order to state a claim under Rule 10b–5(b) the Trustee must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or

---

[71] Doc. 10-1, at 9.
[72] Doc. 28, at 18.
[73] Doc. 28, at 21.

sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[74]  The complaint must also satisfy the heightened pleading requirement of the PSLRA, which, inter alia, mandates that the complaint allege facts giving rise to a strong inference that the defendant acted with the required state of mind.  A plaintiff may satisfy the PSLRA's heightened pleading requirement by alleging facts showing a motive to commit fraud and a clear opportunity to do so, or by identifying circumstances indicating conscious or reckless behavior by defendants, so long as the totality of allegations raises a strong inference of fraudulent intent.[75] The Fifth Circuit has stated that:

> For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.[76]

A complaint must allege particular facts giving rise to a "strong inference" that the defendant made misrepresentations or omissions with "not merely simple or even inexcusable negligence" but rather with the "intent to deceive, manipulate, or defraud" or with "severe recklessness in which the danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it."[77] "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or

---

[74] *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1207 (2013).
[75] *See Tuchman*, 14 F.3d at 1068.
[76] *Southland Sec. Corp.*, 365 F.3d at 366.
[77] *Southland Sec. Corp.*, 365 F.3d at 366.

'permissible,'" in light of other explanations.[78] In other words, a plaintiff can only satisfy the scienter requirement if the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged."[79]

Here, the Trustee alleges that TK&L acted with the requisite fraudulent intent because their extensive involvement with Level III meant that they must have known that the information they were reporting to investors on behalf of Gwyn was false.  He also alleges that TK&L facilitated Gwyn's self-interested transactions despite TK&L's knowledge that they were fraudulent. These allegations, which are outlined in significant detail in the Complaint, give rise to a strong inference of scienter that is at least as compelling as any opposing inference that one could draw from the facts alleged.  Even if TK&L did not intentionally engage in deceptive conduct, the allegations are sufficient to indicate reckless disregard in reporting false information to investors. Defendants' argument that the Trustee failed to meet the heightened pleading requirements for scienter therefore fails.

2. "Makers" under Rule 10b–5(b)

TK&L next argue that the Trustee cannot succeed on its 10b-5(b) claim against them because they are not "makers" of a material misstatement within the meaning of Section 10b–5(b).  To be liable under Rule 10b–5(b), a defendant "must have 'made' the material misstatement" at issue.[80]  As the U.S. Supreme Court explained in *Janus Capital Group, Inc. v. First Derivative Traders*, "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."[81]  "One who prepares or publishes a statement on

---

[78] *Lormand*, 565 F.3d at 239.
[79] *Tellabs*, 551 U.S. at 324.
[80] *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).
[81] *Id.* at 142.

behalf of another is not its maker."[82]  A speechwriter, for example, cannot be held liable under Rule 10b–5(b) because "[e]ven when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it."[83] "[I]t is the speaker who takes credit—or blame—for what is ultimately said."[84] "[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by. . . the party to whom it is attributed."[85]

In *Janus*, the Supreme Court held that a mutual fund investment advisor that "was significantly involved in preparing [a client's] prospectuses" did not "make" the statements contained therein.[86]  Only the client had the "statutory obligation to file the prospectuses" and nothing in the document "indicate[d] that any statements . . . came from" the defendant rather than its client.[87]   The Supreme Court cautioned that a "broader reading of 'make'" would "substantially undermine" the rule prohibiting private suits against aiders and abettors of Rule 10b–5 violations.

Relying on *Janus*, TK&L argue that they were not the "makers" of any actionable misrepresentations because they had "no authority over [the] statements, their content, or when they were made."[88]  They assert that the allegations, taken as a whole, "create the impression that to the extent Turn Key or Lapat aided in the preparation of false material statements, it was at the direction of Gwyn and Level III, who ultimately controlled the statements and to whom the statements were attributable."[89]

---

[82] *Id.*
[83] *Id.* at 143.
[84] *Id.* at 143.
[85] *Id.* at 143–43.
[86] *Id.* at 147-48.
[87] *Id.*
[88] Doc. 10-1, at 12.
[89] Doc. 10-1, at 12.

In opposition, the Trustee argues that Defendants ignore key distinctions between this case and *Janus*.[90]  Most notably, he claims that the Supreme Court's decision in *Janus* "turned primarily on the fact that the statements in the prospectuses were publicly attributed only to the fund itself, such that there could be no reliance by the plaintiff-investors on the advisor's participation, which would be unknown to the investors."[91]  Thus, in the Trustee's view, "*Janus* does not preclude liability of parties who participate in the making of statements when the statements are attributed to them."[92]

As support, the Trustee cites to an opinion from the Southern District of New York, *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 266 (S.D.N.Y. 2014), which held that the defendant-underwriters were the makers of alleged misstatements where the underwriters actively participated in creating the prospectus, the underwriters were required to approve the prospectus before its dissemination to investors, and the underwriters' names appeared prominently on the prospectuses.[93]  The court held that these facts were sufficient to cause the statements within the prospectus to be attributable to the underwriters.[94]  A more recent opinion discussing *Puda* found that the complaint's allegations regarding the involvement of the defendant in the creation and dissemination of the misleading statement must be "specific and particularized."[95]

---

[90] Doc. 28, at 22.

[91] Doc. 28, at 22.

[92] Doc. 28, at 22.

[93] Doc. 28, at 22–23.  The Trustee also cites several other district court opinions that are cited in *Puda* as opinions having reached a similar result. *See Scott v. ZST Digital Networks, Inc.*, 896 F.Supp.2d 877, 890 (C.D. Cal. 2012); *In re Nat'l Century Fin. Enters., Inc.*, 846 F.Supp.2d 828, 861 (S.D. Ohio 2012); *In re Allstate Life Ins. Co. Litig.*, No. cv–09–8162 (GMS), 2012 WL 176497, at *5 (D. Ariz. Jan. 23, 2012).

[94] *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d at 266.

[95] *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 93 (S.D.N.Y. 2015).

Although neither the Fifth Circuit nor this Court have yet had the opportunity to apply *Janus*, the Court concludes that TK&L may be considered "makers" under that decision.  The allegations in the Complaint indicate that Turn Key may have been more than a mere "speechwriter" for Level III.  Indeed, Turn Key was responsible for analyzing information provided by Level III and then distributing the results of that analysis to investors.  The Compliant alleges that Turn Key was responsible for calculating Level III's net asset value and it specifically alleges that the net asset value was fraudulently inflated to mislead investors.  Turn Key was therefore at least partially responsible for the misleading statements disseminated to investors because it conducted the net asset value analysis included therein.  Furthermore, there may have been some confusion among the investors regarding the extent of Turn Key's responsibilities.[96]  Under *Janus* and *Puda*, investor confusion regarding the source of the information weighs in favor of finding Turn Key to be a "maker" because it suggests that the investors attributed the content of the communications to Turn Key and not to Level III.  While it is admittedly a close question, the Court concludes that the Complaint contains sufficient allegations to state a claim against TK&L as makers under the Rule 10b–5(b).

**B. Section 20**

Section 20(a), codified at 15 U.S.C. § 78t(a), provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person."[97]  "Control person" liability under section 20(a) requires an underlying violation of the Exchange Act.[98]   Accordingly, because

[96] *See* Doc. 1-6 ("Hopefully, this [email] will serve to clear up any misunderstandings regarding what it is our company does for Level III and why the accounting for certain months has not yet been completed, resulting in the delay of certain withdrawals.").
[97] *See also Bulmahn*, 2015 WL 7454598 at *31.
[98] *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 680 n.1 (5th Cir. 2014).

the Court finds that the Trustee alleges an Exchange Act violation, TK&L's motion to dismiss the Trustee's Section 20 claim for lack of an underlying violation must be denied.

### 3. Motion to dismiss the claims against A. Gwyn and Treaty

A. Gwyn argues in her motion that the Louisiana state law claims against her should be dismissed because: (1) the bankruptcy court has already held that Louisiana law does not apply to this action; (2) because those claims have prescribed; and (3) because the Complaint fails to name an indispensable party.  She also argues that (1) the Alabama state law claims should be dismissed as time-barred; (2) the claims pursuant to 11 U.S.C. § 548 fail as a matter of law; and (3) any claims to annul contracts should fail as a matter of law because there are no contracts to annul.  Treaty's motion is substantively identical.

The Trustee has filed a single opposition to both motions.  In addition, Defendant Kaplan has filed a brief asserting that, although it "takes no position as to the merits of the [motions to dismiss]," it believes that the bankruptcy court's holding with respect to the choice of law issue was only that Alabama law governs relations among the partners of Level III and between the partners and Level III.[99]  Thus, "Kaplan agrees that Alabama law may govern Level III's claims against partners and limited partners of Level III, but believes that the Bankruptcy Court's ruling is limited to these classes of defendants and does not apply to *all* claims related to Level III."[100]  For the following reasons, the Court concludes that A. Gwyn and Treaty's motions should be denied.

[99] Doc. 20, at 1.
[100] Doc. 20, at 1.

### A. Claims under Louisiana law

First, the Court agrees with the Trustee and Kaplan that the bankruptcy court's holding regarding choice of law, to the extent that it may limit this Court's choice of law determinations, cannot be read as broadly as A. Gwyn and Treaty suggest.  The bankruptcy court decision stated that "Alabama law 'governs the relations among the parties of [the] limited partnership and between the partners and the limited partnership.'"[101]  That holding does not support the proposition that Alabama law must govern all state law claims in this proceeding.  A. Gwyn and Treaty are not, and have never been, limited partners of Level III.  This Court need not engage in a choice of law analysis to determine that this basis for defendants' motions to dismiss is without merit.

Second, the Court agrees with the Trustee that the Louisiana state law claims are timely.  All parties agree that Louisiana Civil Code article 2041 establishes the applicable prescriptive period for the Trustee's state law claims.  Article 2041 provides, in pertinent part:

> The action of the obligee must be brought within one year from the time he learned or should have learned of the act, or the result of the failure to act, of the obligor that the obligee seeks to annul, but never after three years from the date of that act or result.[102]

---

[101] Doc. 17-2, at 7.

[102] The final line of Article 2041 states: "The three year period provided in this Article shall not apply in cases of fraud."  However, the Trustee does not contest A. Gwyn and Treaty's assertion that the fraud exception provided in the final line of Article 2041 does not apply in this case because it was added to the statute on August 1, 2013 and was a substantive change in the law.  *See* Doc. 17-1, at 7 (citing La. Civil Code Art. 6; *Thomassie v. Savoie*, 581 So.2d 1031, 1033–34 (La. App. 1st Cir. 1991) (new prescriptive period for revocatory actions that went into effect in 1984 did not apply retroactively because amendment created liabilities where none existed before and was, thus, substantive)).

The Complaint alleges that fraudulent transfers were made from Level III to Defendants from 2010 through June 2012.[103]   This action was filed on September 28, 2015—clearly outside of the three year peremptive period. Plaintiff argues, however, that "upon commencement of the bankruptcy case, the Bankruptcy Code determines the prescriptive and preemptive periods of avoidance actions."[104]   This Court agrees.

Pursuant to 11 U.S.C. § 544(b), a trustee succeeds to the rights of the bankruptcy estate's creditors to avoid transactions under non-bankruptcy law. "The trustee's successor rights arise under federal law, but the extent of those rights depends entirely on applicable state law."[105]   However, a separate provision in the Bankruptcy Code, 11 U.S.C. § 546(a), "is designed to give the trustee 'some breathing room' to determine which claims to bring under section 544."[106]   Pursuant to 11 U.S.C. § 546(a)(1)(A), the trustee may assert any claim that existed as of the date of the involuntary bankruptcy petition, so long as that claim is filed within two years of the date of the bankruptcy court's order for relief.  In other words, "[i]f an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer" provided that the trustee files the claim within two years of the order for relief.[107]

The petition for bankruptcy was filed August 2, 2013, and the bankruptcy court's order for relief was issued October 1, 2013.  The parties agree that the Trustee's filing of the above-captioned matter on September 28,

---

[103] Doc. 17-1, at 7 (citing to the Complaint, Doc. 1, at 9–10).
[104] Doc. 27, at 7.
[105] *In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010).
[106] *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 677–79 (S.D. Tex. 2007).
[107] *In re Moore*, 608 F.3d at 260.

2015 was within two years of the bankruptcy court's order for relief.[108]   They also do not dispute that the Louisiana state law claims were timely on the date the bankruptcy petition was filed.   Nevertheless, A. Gwyn and Treaty argue that because the three-year period created by Louisiana Civil Code article 2041 is considered peremption, § 546(a) could not prevent the period from expiring prior to the commencement of this action.

As several courts have recognized, however, §§ 544 and 546 preempt state law.[109]   Preemption is possible under the Supremacy Clause because §§ 544 and 546 are a creation of the Bankruptcy Code, derived from the federal government's congressional powers listed in Article I, Section 8, of the Constitution.[110]   Accordingly, the peremptive period set forth by state law is preempted by §§ 544 and 546 of the Bankruptcy Code.   In this case, it appears that the earliest allegedly fraudulent transfers to A. Gwyn and Treaty occurred within three years of the filing of the bankruptcy petition.   Therefore, those claims existed, and were not yet preempted, at the time of the involuntary bankruptcy petition.   Defendants' claim that the Trustee's claims were untimely fails.

Third, the Court agrees with the Trustee that he did not fail to include a required party to this litigation by omitting Level III as a defendant.   Rule 19(a)(1) defines a "required" party:

> A person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims

---

[108] *See* Doc. 27, at 8; Doc. 36, at 4.

[109] *See, e.g.*, *Andres Holding Corp. v. Villaje Del Rio, Ltd.*, 2011 WL 860529, at *11 (W.D. Tex. Mar. 8, 2011) (gathering cases).

[110] *See Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 519 (5th Cir. 2009) ("The subject of bankruptcy falls within the express constitutional powers of Congress, and bankruptcy law therefore takes precedence over state laws under the Supremacy Clause.") (citing U.S. Const., art. VI).

> an interest relating to the subject of the action and is so situated
> that disposing of the action in the person's absence may: (i) as a
> practical matter impair or impede the person's ability to protect
> the interest; or (ii) leave an existing party subject to a substantial
> risk of incurring double, multiple, or otherwise inconsistent
> obligations because of the interest.

As A. Gwyn and Treaty correctly point out, Louisiana Civil Code article 2042 states that "[i]n an action to annul either his obligor's act, or the result of his obligor's failure to act, the obligee must join the obligor and the third persons involved in that act or failure to act." Accordingly, they argue that Level III, the transferor in the allegedly fraudulent transactions at issue, must either be added as a party or else the claims against them must be dismissed for failure to include a required party.[111] As the Trustee explains, however, he filed this lawsuit in his capacity as the court-appointed trustee of the Level III Trading Partners, L.P. Litigation Trust.

The litigation trustee represents the bankruptcy estate by assuming the obligations to prosecute the bankruptcy estate's claims for the benefit of creditors.[112] "Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, including causes of action belonging to the debtor at the commencement of the bankruptcy case, vest in the bankruptcy estate upon the filing of a bankruptcy petition."[113] "Thus, a trustee, as the representative of the bankruptcy estate, is the real party in interest, and is the only party with standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed."[114] Accordingly, Level III is a party to this action through the Trustee, and it need not be joined as a required party.

---

[111] Doc. 18-1, at 8–9.
[112] *Railworks Corp.,* 325 B.R. at 719.
[113] *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (citing 11 U.S.C. § 541(a)(1)).
[114] *Id.* (citations omitted).

Accordingly, Defendants' arguments for dismissal of the Trustee's Louisiana state law claims fail.[115]

## B. Claims under Alabama law

A. Gwyn and Treaty argue that claims made pursuant to the Alabama Fraudulent Transfer Act § 8-9A-1, *et seq.* ("AFTA") should likewise be dismissed as prescribed. Specifically, they argue that a one-year statute of limitations is applicable to such claims, and that more than one year has passed since the most recent allegedly fraudulent transfers in 2012 and the filing of this lawsuit in 2015.[116] The Trustee again responds that 11 U.S.C. § 546 preserves for the bankruptcy trustee any claim that existed as of the date of the involuntary bankruptcy petition. He also argues that the appropriate statute of limitations for the trustee's claims under the AFTA is four years, not one year as Defendants propound.[117]

For the reasons provided earlier in this opinion, pursuant to 11 U.S.C. § 546 the Trustee timely filed whatever claims were viable as of the date of the bankruptcy petition.[118] The only question is, therefore, whether the Trustee's claims pursuant to the AFTA expired prior to the date that the bankruptcy petition was filed.

"The [AFTA] . . . provides that certain transfers 'made by a debtor' may be found void or voidable as to creditors."[119] "The [AFTA] statutory scheme includes four different types of 'fraudulent transfers' upon which liability may

---

[115] The Court notes that in addressing defendants' arguments for dismissal of the Trustee's Louisiana state law claims, it does not decide whether Louisiana law applies to this action.
[116] Doc. 18-1, at 10.
[117] Doc. 27, at 9–11.
[118] *See In re Moore*, 608 F.3d at 260.
[119] *Peacock Timber Transp., Inc. v. B.P. Holdings, LLC*, 115 So. 3d 914, 918 (Ala. 2012).

be predicated."[120]  Different limitations periods are established for each of these types:

> A claim for relief with respect to a fraudulent transfer under this chapter is extinguished unless action is brought:
>
> (1) Under Section 8-9A-4(a) within 10 years after the transfer of real property was made.
> (2) Under Section 8-9A-4(a) within six years after the transfer of personal property was made.
> (3) Under Section 8-9A-4(c) or 8-9A-5(a), within four years after the transfer was made when the action is brought by a creditor whose claim arose before the transfer was made.
> (4) Under Section 8-9A-4(c), within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made; or
> (5) Under Section 8-9A-5(b), within one year after the transfer was made.[121]

All parties concede that subsections (1) and (2) do not apply.  Defendants argue that subsection (4) or (5) applies because the Complaint does not allege that the AFTA claim arose before the allegedly fraudulent transfers were made.  The Trustee argues that subsection (3) applies but provides no explanation to support his position.  The Complaint does not specify the section under which the Trustee is asserting his AFTA claim.

That said, even if this Court determined that the shorter period applied, it could not dismiss the Trustee's AFTA claims on timeliness grounds because there remains an issue as to when the limitation period on his AFTA claims began to run. Fraud claims under Alabama law do not accrue "until the discovery by the aggrieved party of the fact constituting the fraud" or the cause

---

[120] *SE Prop. Holdings, LLC v. Braswell*, No. 13-0267-WS-N, 2013 WL 4498700, at *2 (S.D. Ala. Aug. 21, 2013) (citations omitted).
[121] Ala. Code § 8–9A–9.

of action fraudulently concealed.[122]  In this case, the bankruptcy petition was filed only shortly after the NFA instituted emergency action against Level III, and it appears from the Complaint that such emergency action was the trigger that alerted Level III's investors to the alleged fraud.  It follows then that, at the very least, an issue exists with respect to when the AFTA claims were discovered.  Dismissal of the trustee's claims pursuant to the AFTA is therefore unwarranted.[123]

### C. Claims pursuant to 11 U.S.C. § 548

Section 548 of the Bankruptcy Code allows a trustee to recover fraudulent transfers made by the debtor prior to bankruptcy.[124]  A. Gwyn and Treaty argue that the Trustee's claims pursuant to 11 U.S.C. § 548 must be dismissed for two reasons.  First, they argue that because such claims are limited to transfers that occurred within two years of the filing of the bankruptcy petition, the Trustee's claims as to transfers before August 2, 2011 are time barred.  Second, Defendants summarily allege that the Trustee fails to provide sufficient factual content "to support a plausible claim that Treaty should be deemed a transferee of funds it never received and now be ordered to return those funds to the Litigation Trust," and so his claims must be dismissed.[125]

The Trustee responds by accurately pointing out that his Complaint "expressly pleads [that] those transactions that should be avoided pursuant to Section 548 are limited to those that occurred within two years of the

---

[122] Ala. Code § 6–2–3; *see In re Vioxx Products Liab. Litig.*, 478 F. Supp. 2d 897, 908 (E.D. La. 2007) (Fallon, J.) (quoting *Rutledge v. Freeman*, 914 So.2d 364, 369–71 (Ala. Civ. App. 2004) (cited with approval in *Jett v. Wooten*, 110 So. 3d 850, 855 (Ala. 2012)).
[123] Again, the Court emphasizes that in addressing Defendants' arguments it has not made a finding as to the applicability of Alabama law.
[124] *In re Positive Health Mgmt.*, 769 F.3d 899, 901 (5th Cir. 2014) (citing 11 U.S.C. § 548(a)).
[125] Doc. 18-1, at 11.

Involuntary Petition."[126]   Having reviewed his Complaint, the Court also concludes that it provides sufficient factual content to support these allegations.[127]   A. Gwyn and Treaty's motions to dismiss these claims are therefore denied.

### D. Claims to annul contracts

Finally, Defendants argue that the claims to annul several allegedly gratuitous contracts asserted in claim four of the Complaint should be dismissed for failure to identify even a single contract between Level III and A. Gwyn and Treaty.[128]   The Trustee asserts in response that "the Complaint clearly identifies the following contracts [with A. Gwyn] and transactions made nominally [with A. Gwyn] pursuant to such contracts: incentive payments under the partnership agreement, payments for 'administrative services' under a contract for the provision of administrative services, and rent paid under a contract of lease."[129]   He bolsters his response with citations to the record.  With respect to Defendants' arguments as to Treaty, the Trustee states that the Complaint nowhere seeks to annul contracts between Level III and Treaty, hence Treaty is attempting to dismiss a claim that the Complaint does not purport to allege.

The Trustee is correct that the Complaint does not seek annulment of any contracts with Treaty, and the motion to dismiss with respect to such claims should therefore be denied as moot.  With respect to A. Gwyn, the Complaint does sufficiently identify the contracts that the Trustee seeks to

---

[126] Doc. 27, at 12 (citing Doc. 1, at 28 ("The transfers set forth in this petition that occurred within two years of the date of the Involuntary Petition, August 2nd, 2013, caused or increased the debtor's insolvency. . . .")).

[127] *See* Doc. 1, at 21–24.

[128] Doc. 18-1, at 12.

[129] Doc. 27, at 12.

undo.  Accordingly, the motion to dismiss the claims to annul those contracts must also be denied.

### 4.  TK&L's Motion to Dismiss Cross-Claims

Finally, Defendants TK&L move for dismissal of cross-claims asserted against them by Bruce Gwyn and Andrew Reid.  TK&L contend that Gwyn and Reid's cross-claims should be dismissed for three reasons.  First, they argue that they are in default for failure to defend the cross-claims.  Second, they argue that their claims do not satisfy the pleading rules required by Rule 8.  Finally, they argue that the claims are procedurally improper pursuant to Rule 13(g) and amount merely to affirmative defenses.  No opposition was filed to this Motion.

First, TK&L correctly point out that prior to the withdrawal of the reference, the bankruptcy court had entered default against Gwyn for failure to file an answer or otherwise defend the case.[130]  Gwyn has not sought relief from default from either this court or the bankruptcy court, nor has he asked this court to review the bankruptcy court's entry of default.  The filing of an answer cannot cure a default.[131]  Accordingly, Defendant Bruce Gwyn's answer is stricken from the record.

Having stricken Gwyn's answer, this Court will address TK&L's remaining arguments only as they related to Reid.  TK&L next argue that the cross-claims filed by Reid do not satisfy the requirements of Federal Rule of Civil Procedure 8(a), requiring "a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[130] *Cotter v. Gwyn et al.*, No. 15-01057, Doc. 18 (Bankr. E.D. La. Dec. 3, 2015).

[131] *Directv, Inc v. Young*, 195 F. App'x 212, 215 (5th Cir. 2006); U*.S. ex rel. Mid State Const. Co. v. Travelers Cas. & Sur. Co. of Am.*, No. 5:11-CV-169, 2013 WL 4787378, at *2 (S.D. Miss. Sept. 6, 2013).

The cross-claims brought by Reid against TK&L state, in their entirety, the following:

> Gwyn and Reid cross-claim pursuant to Rule 13(g) of the Federal Rules of Civil Procedure against the following parties for the following reasons:
>
> 1.) Turnkey, in that all actions by Gwyn were based on assurances by Turnkey that said transactions were permissible and should it eventuate that Turnkey was wrong, the Gwyn is entitled to judgment-over against Turnkey; . . .
>
> 3.) Without suggesting that Lapat has any liability to the plaintiffs, Gwyn and Reid claim the right to a judgment-over against Lapat should it eventuate that Lapat did anything that he should not have done, or omitted to do something he should have done.[132]

The cross-claim against Turnkey seeks relief only on behalf of Gwyn and therefore that claim has already been stricken as discussed above.  The cross-claim by Reid against Lapat falls woefully below the standard required by the federal rules.  Reid's cross-claim against Lapat is among the vaguest and most deficient this Court has seen.  A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[133]  An allegation that the defendant may have done "something he should not have done" does not meet this basic threshold.  Accordingly, Reid's cross-claim against Lapat is dismissed, and Reid is given leave to amend his cross-claim to the extent that he can state a claim.

## CONCLUSION

For the foregoing reasons, TK&L's Motion to Dismiss the Trustee's claims pursuant to Sections 10 and 20 of the Exchange Act is **DENIED**; A. Gwyn and Treaty's Motions to Dismiss are likewise **DENIED**; and TK&L's Motion to Dismiss Cross-claims is **GRANTED**.  The Answer filed by Defendant

---

[132] Doc. 23.
[133] *Twombly*, 550 U.S. at 555.

Bruce Gwyn (Doc. 23) is **STRICKEN**, and Defendant Andrew Reid's cross-claim against Michael Lapat is **DISMISSED WITHOUT PREJUDICE**.  Reid may amend his cross-claim within 15 days of this Order to the extent that he can properly state a claim against Lapat.


New Orleans, Louisiana this 25th day of August, 2016.


**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**